UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# ORIGINAL

------------------------------------------X

THE NASDAQ OMX GROUP, INC. and THE
NASDAQ STOCK MARKET LLC,

              Plaintiffs,

  - against -

UBS SECURITIES LLC,

              Defendant.

------------------------------------------

13 Civ. 2244

OPINION
UNDER SEAL

103402

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/11/13

A P P E A R A N C E S:

Attorneys for the Plaintiffs The NASDAQ OMX Group,
Inc. and The NASDAQ Stock Market LLC
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
By:  William A. Slaughter, Esq.
     Paul Lantieri, III, Esq.
     Stephen J Kastenberg, Esq.


Attorneys for Defendant UBS Securities LLC
PAUL, WEISS, RIFKIND, WHARTON & GARRISON
1285 Avenue of the Americas
New York, NY 10019-6064
By:  Leslie Gordon Fagen, Esq.
     Charles E. Davidow, Esq.
     Daniel J. Toal, Esq.

1

**Sweet, D.J.**

Plaintiffs The NASDAQ OMX Group, Inc. and The NASDAQ Stock Market LLC (collectively "NASDAQ" or the "Plaintiffs") have moved to enjoin an arbitration filed by defendant UBS Securities LLC ("UBS" or the "Defendant"), and UBS has cross-moved to dismiss NASDAQ's complaint (the "Complaint") with prejudice.

Upon the facts and conclusions set forth below, NASDAQ's motion for preliminary injunction is granted and UBS' cross-motion to dismiss is denied.

## I. Prior Proceedings

This dispute arose from system failures during the May 18, 2012 initial public offering ("IPO") of Facebook, Inc. ("Facebook") by NASDAQ.

On March 15, 2013, UBS filed with the American Arbitration Association (the "AAA") an arbitration demand and statement of claims (the "Demand"). UBS asserted four claims of relief in the Demand for: (i) breach of contract of the Services Agreement for NASDAQ's alleged failure to honor its

indemnification obligations; (ii) indemnification under the
NASDAQ Services Agreement (the "Services Agreement"); (iii)
breach of contractual duty of good faith and fair dealing
arising from NASDAQ's alleged failure to timely inform its
members of its systems issues, and refusal to cancel certain UBS
trades as allegedly would have been permitted by Exchange rules;
(iv) gross negligence based on NASDAQ's use of allegedly
insufficiently tested and unprecedented systems and procedures
during the Facebook IPO.  (Demand ¶¶ 58-76).  According to UBS,
it suffered monetary damages "believed to be in excess of $350
million."  (Id. ¶ 76).

        Pursuant to AAA rules, NASDAQ's answering statement to
UBS' Demand was due on April 4, 2013.  On that day, NASDAQ filed
its Complaint for declaratory and injunctive relief in the
Southern District of New York and moved to enjoin UBS from
proceeding with the arbitration.  UBS opposed NASDAQ's motion
and made a cross-motion to dismiss the Complaint.  Both motions
were marked fully submitted on May 2, 2013.

## II.  **Background**

        The following factual background is drawn from the
Complaint, the Demand, and from documents referenced in or

integral to the Complaint as submitted by the parties.

UBS is a Delaware limited liability company with its principal place of business in New York, New York.  (Id. ¶ 9). It is a registered broker-dealer and investment adviser that provides financial services to private, corporate and institutional clients.  (Id.).

NASDAQ is a major American stock exchange and a self-regulatory organization ("SRO") registered with the Securities and Exchange Commission ("SEC") to operate a national securities exchange under Section 6 of the Securities Exchange Act of 1934(the "Exchange Act"), 15 U.S.C. § 78f.  (Compl. ¶ 11); See In the Matter of the NASDAQ Stock Mkt. LLC for Registration as a Nat'l Sec Exchange; Findings, Opinions, and Order of the Comm'n, SEC Rel. No. 34-53128 (Jan. 13, 2006), 71 Fed. Reg. 3550 (Jan. 23, 2006).  It has operated as a for-profit publicly traded company since 2000.

The Facebook IPO

After engaging in a competitive bidding process with the New York Stock Exchange (the "NYSE"), NASDAQ won the right to host the eagerly anticipated IPO of Facebook.  On May 18,

4

2012, Facebook offered 421 million shares of its common stock to the public at $38.00 per share on the NASDAQ stock exchange, thereby valuing the total size of the IPO at more than $16 billion.  The IPO was initially set to open at 11:05 am Eastern Standard Time under the NASDAQ ticker symbol "FB," but was delayed.  See In re Facebook, Inc., IPO Sec. & Deriv. Litig., MDL No. 12-2389, --- F. Supp. 2d ---, 2013 WL 525191, at *2 (S.D.N.Y. Feb. 13, 2013) ("Zack").

According to NASDAQ's proposal to amend Rule 4626,[1] starting at 11:05:10 a.m., having proceeded with the Display-Only period and the Quote-Only period, NASDAQ experienced system difficulties during the NASDAQ Halt and Imbalance Cross Process (the "Cross"), until 11:30 a.m.  See Notice of Filing of Proposed Rule Change to Amend Rule 4626 – Limitation of Liability, SEC Rel. No. 34-67507 (July 26, 2012), 77 Fed. Reg. 45,709 (Aug. 1, 2012) (the "Accommodation Proposal").  The cross process during the first minutes of the Facebook IPO did not operate as expected.  (Id.).  To protect the "integrity of the IPO process, the system [for executing the Cross] is designed to recalculate the IPO auction if the matching engine's view of the

---

[1] Rule 4626 was adopted on January 13, 2006 as part of NASDAQ's registration as a national securities exchange.  Securities Exchange Act Release No. 53128 (Jan. 13, 2006), 71 Fed. Reg. 3550 (Jan. 23, 2006) (File No. 10-131).  The rule was amended in 2011 to its current version.  See Securities Exchange Act Release No. 64365 (Apr. 29, 2011), 76 Fed. Reg. 25384 (May 4, 2011) (SR-NASDAQ-2011-058).

auction book has changed between the time of the final
calculation and the printing of the opening trade." (Id.).   In
the case of the Facebook IPO, "[a]fter the initial calculation
of the Cross was completed, but before the opening trade was
printed, additional order modifications were received by the
system, changing the auction order book." (Id.).   "As designed,
the system recalculated the Cross to factor in the new state of
the book [, but again], changes were received before the system
could print the opening trade." (Id.).   "This condition
persisted, resulting in further delay of the opening print."
(Id.).

NASDAQ determined that a system modification was
needed to resolve these issues and determined to institute the
modification, but it proceeded with the IPO rather than to halt
the Cross auction process. (Id.).   "At 11:30:09 a.m., NASDAQ
completed the Cross, printed [the opening trade] at $42.00 to
the tape, and opened continuous trading," which proceeded
without incident. (Id. at 45,709).

New order, cancel and replace messages received before
approximately 11:11 a.m. were acknowledged and incorporated into
the Cross order book in real time. (Id.).   Some orders received
by NASDAQ between 11:11 a.m. and 11:30 a.m., however, were not

6

executed in the Cross; some were cancelled in the ordinary
course by members before the Cross; some were entered into the
continuous trading market at 11:30 a.m. as they should have
been, and the remainder were either cancelled or released into
the market at 1:50 p.m. (Id. at 45,709 n.23).  In addition,
transaction confirmation messages for orders executed in the
Cross at 11:30 a.m. were not disseminated until 1:50 p.m.  (Id.
at 45,709).  In the period between 11:30 a.m. and 1:50 p.m.,
although system issues had prevented NASDAQ from immediately
disseminating Cross transaction reports, NASDAQ determined not
to halt trading in Facebook stock. (See id. at 45,707).


        Following the commencement of trading, NASDAQ believed
that the remaining system issues would be resolved promptly, and
also concluded that there was an orderly, liquid and deep market
in Facebook stock, with active trading in the stock on NASDAQ
and other markets. (Id.).   This assessment also led NASDAQ to
conclude that the conditions after 11:30 a.m. did not warrant a
halt of trading. (See id.; see also Exchange Rule 4120(a))
(addressing the Exchange's authority to halt trading).


The Exchange Rules


        With limited exceptions, the SEC approves all exchange

rules, policies and practices prior to implementation.  15

U.S.C. §§ 78f & 78s.  Before it may permit the registration of

an exchange as a SRO under the Exchange Act, the SEC must

determine, among other things, that the exchange will have a set

of rules that is "consistent with the requirements of the

Exchange Act, 15 U.S.C. § 78s(b)(2), and designed

> to prevent fraudulent and manipulative acts and
> practices, to promote just and equitable principles of
> trade, to foster cooperation and coordination with
> persons engaged in regulating, clearing, settling,
> processing information with respect to, and
> facilitating transactions in securities, to remove
> impediments to and perfect the mechanism of a free and
> open market and a national market system, and, in
> general, to protect investors and the public interest
> . . . .

15 U.S.C. § 78f(b)(5).


        To trade on NASDAQ, a member must submit an

application for membership, be approved, and enter into the

NASDAQ Membership Agreement, which broadly governs the

conditions of the membership in NASDAQ (the "Membership

Agreement").  Among other things, prospective members agree

"[t]o comply with the federal securities laws, the rules and

regulations thereunder, the NASDAQ rules and all rulings,

orders, directions and decisions issued and sanctions imposed

under the NASDAQ rules[.]"  (Membership Agreement ¶ A).  NASDAQ

Rule 4611(a)(3) also provides that "[p]articipation in the Nasdaq Market Center . . . requires . . . compliance with all applicable rules and operating procedures of Nasdaq and the [SEC] in their use of the System."  NASDAQ Rule 4611(a)(3).

Further, the Exchange Act requires exchanges to enforce compliance with their rules by their members.  See 15 U.S.C. §§ 78f(b)(1) & 78s(g)(1).  Members that do not comply with NASDAQ's rules may be subject to discipline by NASDAQ, and those determinations may be appealed to the SEC and ultimately, the federal appellate courts.  See NASDAQ Rules 9200 et seq. ("Disciplinary Proceedings") & 9300 et seq. ("Review of Disciplinary Proceeding by Nasdaq Review Council and Nasdaq Board; Application for Commission Review"); see also 15 U.S.C. § 78y (review of final SEC orders by Courts of Appeal).

NASDAQ is likewise obligated to comply with its rules and regulations, or be subject to sanction by the SEC for failure to do so.  See 15 U.S.C. § 78s(g)(1) ("Every self-regulatory organization shall comply with the provision of [the Exchange Act], the rules and regulations thereunder, and its own rules . . . ."); 15 U.S.C. §§ 78u(d), (f) (SEC enforcement authority); 15 U.S.C. § 78s(h)(1), (4) (remedies available against SROs); see also Merrill Lynch, Pierce, Fenner & Smith,

<u>Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.</u>, 616 F.2d 1363, 1367-68 (5th Cir. 1980) (discussing the sanctioning power of the SEC).

NASDAQ and its members may not modify or waive compliance with SEC-approved Exchange rules by contract or otherwise.  Section 29 of the Exchange Act provides that "[a]ny condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of a self-regulatory organization, shall be void."  15 U.S.C. § 78cc(a); <u>see Harsco Corp. v. Segui</u>, 91 F.3d 337, 343 (2d Cir. 1996) ("[T]he voluntariness of an agreement is irrelevant to whether § 29(a) forbids it.") (citation omitted).

Instead, pursuant to Section 19(b) of the Exchange Act, 15 U.S.C. § 78s(b) and Rule 19b-4, 17 C.F.R. § 240.19b-4, promulgated by the SEC thereunder, any proposed changes to SRO rules must also be approved by the SEC.  Even after approval, the SEC retains the right to "abrogate, add to, and delete from" any SRO rule as it "deems necessary or appropriate to insure the fair administration of the [SRO], to conform its rules to requirements of [the Exchange Act] and the rules and regulations thereunder applicable to such organization, or otherwise in

10

furtherance of the purposes of [the Exchange Act.]"  15 U.S.C. §

78s(c); see also DL Capital Group, LLC v. Nasdaq Stock Mkt.,

Inc., 409 F.3d 93, 95 (2d Cir. 2005) ("[T]he SEC has extensive

involvement with, and broad oversight of, SROs, including the

responsibility to approve or reject any rule, practice, [or]

policy . . . proposed by an SRO.").


NASDAQ Rule 4626


Approved by the SEC as consistent with Section 6 of

the Exchange Act, NASDAQ Rule 4626(a) strictly limits NASDAQ's

liability for losses by members arising from their use of

NASDAQ's trading systems as follows:


> Except as provided for in paragraph (b) below, Nasdaq
> and its affiliates shall not be liable for any losses,
> damages, or other claims arising out of the Nasdaq
> Market Center or its use.  Any losses, damages, or
> other claims, related to a failure of the Nasdaq
> Market Center to deliver, display, transmit, execute,
> compare, submit for clearance and settlement, adjust,
> retain priority for, or otherwise correctly process an
> order, Quote/Order, message or other data entered
> into, or created by, the Nasdaq Market Center shall be
> absorbed by the member, or the member sponsoring the
> customer, that entered the order, Quote/Order, message
> or other data into the Nasdaq Market Center.


Rule 4626(a); see Exch. Registration Approval Order, 71 Fed.

Reg. at 3,551.

Rule 4626(b) sets forth an exception to Rule 4626(a) and the exclusive accommodation procedure to be followed by members seeking accommodation thereunder:

> (b) Nasdaq, subject to the express limits set forth below, may compensate users of the Nasdaq Market Center for losses directly resulting from the systems' actual failure to correctly process an order, Quote/Order, message, or other data, provided the Nasdaq Market Center has acknowledged receipt of the order, Quote/Order, message, or data.

Rule 4626(b).

Since the beginning of 2006, NASDAQ has approved and provided accommodations pursuant to Rule 4626 and its predecessor approximately 300 times in connection with more than 140 different incidents.  UBS has also received accommodations 38 times as a result of NASDAQ system issues, which included marketable orders not being filled in an IPO Cross, delayed execution of orders, delayed or unacknowledged order messages, an inadvertent market open message, and system connectivity issues.  (See Decl. of David E. Lawn, dated April 2, 2013, ¶¶ 3-11).

In July 2012, NASDAQ filed with the SEC a proposal to

amend Rule 4626(b) to compensate NASDAQ's members for losses
directly attributable to systems issues, up to a total of $62
million, experienced by NASDAQ in connection with the Facebook
IPO. (See generally Accommodation Proposal). The SEC approved
the proposal on March 22, 2013, which stated that "[u]nder
current Nasdaq Rule 4626(b)(1) [prior to the amendment for
claims arising from the Facebook IPO], payment of all such
claims made by all market participants during a single calendar
month [could not] exceed the larger of $500,000 or the amount of
recovery obtained by Nasdaq under any applicable insurance
policy." (See Accommodation Proposal Approval Order at 19,045).

    As approved by the SEC, Rule 4626(b)(3) provides:


        Notwithstanding subsections (b)(1) and (2) above, for
        the aggregate of all claims alleged by all market
        participants related to errors in the Nasdaq Halt and
        Imbalance Cross Process in connection with the initial
        public offering of Facebook, Inc. (the "Cross"),
        including any delay in delivery of confirmations of
        order in Facebook, Inc. stock on May 18, 2012, the
        total amount of Nasdaq's payment shall not exceed $62
        million. Eligibility of claims for payment shall be
        determined in accordance with the following
        procedures: . . . .

Rule 4626(b)(3). The subsequent provisions detail, among other
things, the specific types of Facebook IPO orders eligible for

accommodation[2] and the formula for calculating members' eligible losses in respect of such orders.  Id.  In addition, they set forth the procedures, which are reproduced in part below, for the submission, consideration, and payment of claims:

> (D)  All claims pursuant to this subsection must be submitted in writing not later than 11:59 p.m. ET on April 8, 2013, and shall be processed and evaluated by the Financial Industry Regulatory Authority ("FINRA") applying the accommodation standards set forth in this Rule.  FINRA may request such supplemental information as FINRA deems necessary to assist FINRA's evaluation of claims.

> (E) FINRA shall provide to the Nasdaq Board of Directors and the Board of Directors of The NASDAQ OMX Group, Inc. an analysis of the total value of eligible claims submitted under this subsection (b)(3).  Nasdaq will thereafter file with the Securities and Exchange Commission a rule proposal setting forth the amount of eligible claims under the standards set forth in this Rule and the amount proposed to be paid to members by Nasdaq.  In no event shall Nasdaq make any payments on claims pursuant to this subsection (b)(3) until the rule proposal setting forth the amount of eligible claims becomes effective and final.  All payments shall be made in cash.

> (F) All payments to members under this subsection will

---

[2] The Cross orders eligible for the compensation claims included:

(i) SELL Cross orders that were submitted between 11:11 a.m. ET and 11:30 a.m. ET on may 18, 2012, that were priced at $42.00 or less, and that did not execute.  (ii) SELL Cross orders that were submitted between 11:11 a.m. ET and 11:30 a.m. ET on may 18, 2012, that were priced at $42.00 or less, and that executed at a price below $42.00.  (iii) BUY Cross orders priced exactly at $42 or less and that were executed in the Cross but not immediately confirmed, but only to the extent entered with respect to a customer that was permitted by the member to cancel its order prior to 1:50 p.m. and for which a request to cancel the order was submitted to Nasdaq by the member, also prior to 1:50 p.m.

(Accommodation Proposal at 45,707-08).

be contingent upon the submission to Nasdaq, not later than 7 days after the effective date of the rule proposal described in paragraph (b)(3)(E), of an attestation detailing:

>    (i)   the amount of compensation, accommodation, or other economic benefit provided or to be provided by the member to its customers (other than customers that were brokers or dealers trading for their own account) in respect of trading in Facebook Inc. on May 18, 2012 ("Customer Compensation"), and

>    (ii)   the extent to which the losses reflected in the Member's Share were incurred by the member trading for its own account or for the account of a customer that was a broker or dealer trading for its own account ("Covered Proprietary Losses").

Failure to provide the required attestation within the specified time limit will void the member's eligibility to receive an accommodation pursuant to this subsection.  Each member shall be required to maintain books and records that detail the nature and amount Customer Compensation and Covered Proprietary Losses.

*****

(H) All payments to members under this subsection will be contingent upon the execution and delivery to Nasdaq of a release by the member of all claims by it or its affiliates against Nasdaq or its affiliates for losses that arise out of, are associated with, or relate in any way to the Facebook, Inc. IPO Cross or to any actions or omissions related in any way to that Cross, including but not limited to the execution or confirmation of orders in Facebook, Inc. on may 18, 2012.  Failure to provide the required release within 14 days after the effective date of the rule proposal described in paragraph (b)(3)(E) will void the member's eligibility to receive an accommodation pursuant to this subsection.

Rule 4626(b)(3)(D)-(F), (H).

<u>The Services Agreement</u>

In May 2006, NASDAQ and UBS entered the form Services Agreement, which all NASDAQ members enter into and which concerns members' use of NASDAQ's services.  (Compl. ¶¶ 36-37).

Among the terms that NASDAQ included in the Services Agreement, the following sections are relevant to the instant action.  Section 12.B contains an indemnification provision, as follows:

> NASDAQ OMX shall be liable to, indemnify against, and hold Subscriber, its employees, directors, and other agents harmless from, any and all Claims or Losses (as those terms are defined in subsection (F) herein) imposed on, incurred by or asserted against Subscriber, its employees, directors, and other agents to the extent that the Claims and Losses result: (i) from acts or omissions of NASDAQ OMX, its employees, directors, agents or associated persons; or from the receipt or use of Subscriber's Data (including representations about Subscriber's Data) by NASDAQ OMX, its employees, directors, or agents . . . .

(Services Agreement § 12.B).  The Services Agreement defines "Claims or Losses" to include any and all losses of whatever nature, including trading losses, that are incurred by UBS.[3]

---

[3] Section 12.G of the Services Agreement defines "Claims and Losses" as follows:

Section 18 of the Services Agreement, entitled

"Arbitration," provides, in part:


    A.      Except as may be provided in the NASDAQ OMX
Requirements,[4] all claims disputes, controversies, and
other matters in question between the Parties to this
Agreement and the Parties' employees, directors,
agents and associated persons arising out of, or
relating to this Agreement, or to the breach hereof,
shall be settled by final binding arbitration in
accordance with this Agreement and the following
procedure or such other procedures as may be mutually
agreed upon by the Parties.

    B.      Except as otherwise provided herein or by
agreement of the Parties, any arbitration proceeding
shall be conducted in accordance with the Commercial
Arbitration Rules of the American Arbitration

---

[A]ny and all liabilities, obligations, losses, damages,
penalties, claims, actions, suits, judgments, and reasonable
costs and expenses of whatever nature, whether incurred by or
issued against an indemnified Party, including without
limitation: (i) indirect, special, punitive, consequential, or
incidental loss or damage (including, but not limited to, trading
losses, loss of anticipated profits, loss by reason of shutdown
in operation or increased expenses of operation, or other
indirect loss or damage); and (ii) reasonable administrative
costs, litigation costs, and auditors' and attorneys' fees, both
in-house and outside counsel, and related disbursements.


[4] The term "NASDAQ OMX Requirements" is defined to consist of "(i) the rules,
regulations, interpretations, decisions, opinions, orders and other
requirements of the [SEC]; (ii) the applicable rules, regulations,
disciplinary decisions, and rule interpretations of self-regulatory
organizations; (iii) NASDAQ OMX's operating procedures, specifications,
requirements, and other documentation that is regulatory or technical in
nature (including, but not limited to, user guides) published on the NASDAQ
Trader website located at www.nasdaqtrader.com ("NASDAQ Trader") or another
NASDAQ OMX website accessible by and made known to Subscriber; (iv) all other
applicable laws, statutes, rules, regulations, orders, decisions,
interpretations, opinions, and other requirements, whether promulgated by the
United States or any other applicable jurisdiction (including in the area of
intellectual property); and (v) the successors, as they may exist at the
time, of the components of the NASDAQ OMX Requirements."

(Services Agreement § 1.A.).

Association or in accordance with such other rules and procedures as are agreed to by the Parties.  The number of arbitrators to preside over an arbitration shall be as follows: . . . (c) where the amount being sought is more than $500,000.00, five (5) arbitrators shall preside.

...

D.   The arbitration proceeding shall be held in the City of New York, unless otherwise agreed by the Parties.  The decision rendered through arbitration shall be final and binding upon the Parties hereto and judgment may be entered in accordance with applicable law in any court having jurisdiction thereof.

(Id. §§ 18(A) - (B)).

Section 17 of the Services Agreement entitled "Entire Agreement" states that:  "In the event of any conflict between the provision of the [Services Agreement], the Attachments [thereto], or the NASDAQ Requirements, the order of preference shall be the NASDAQ Requirements, the Attachments, and the [Services Agreement]."  (Id. § 17).

The Services Agreement also contains a limitation of liability provision, which states:

EXCEPT AS MAY (i) OTHERWISE BE SET FORTH HEREIN; (ii) OTHERWISE BE SET FORTH IN (a) NASDAQ RULE NUMBERED 4626 (AS SUCH RULE MAY BE AMENDED OR RE-NUMBERED FROM TIME TO TIME) OR (b) ANY OTHER APPLICABLE EXCHANGE RULE OF A NASDAQ OMX U.S. EXCHANGE; (iii) ARISE FROM NASDAQ OMX'S INDEMINFICATION OBLICATIONS; OR (iv)

ARISE AS A RESULT OF NASDAQ OMX'S WILLFUL TORTIOUS
MISCONDUCT OR FROM PERSONAL INJURY OR WRONGFUL DEATH
CLAIMS, NASDAQ OMX SHALL NOT BE LIABLE TO SUBSCRIBER
OR TO ANY OTHER INDIVIDUAL OR ENTITY FOR TRADING
LOSSES, LOSS OF ANTICIPATED PROFITS, LOSS BY REASON OF
SHUTDOWN IN OPERATION OR FOR INCREASED EXPENSES OF
OPERATION, OR FOR INDIRECT, SPECIAL, PUNITIVE,
CONSEQUENTIAL, OR INCIDENTAL LOSS OR DAMAGE OF ANY
NATURE ARISING FROM ANY CAUSE WHATSOEVER, EVEN IF
NASDAQ OMX HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH
DAMAGES.

(Id. § 11.A.).  In the same section, the parties to the Services

Agreement acknowledge that they "UNDERSTAND AND AGREE THAT THE

PRICING FOR [NASDAQ'S SERVICE] REASONABLY REFLECTS THE ALOCATION

OF RISK AND LIMITATION OF LIABILITY SET FORTH IN THIS SECTION."

(Id. § 11(C)).


**III. Discussion**


**A) This Action Implicates Substantial Federal Questions Over
Which This Court Has Subject Matter Jurisdiction**

Dismissal of a case for lack of subject matter

jurisdiction is proper "when the district court lacks the

statutory or constitutional power to adjudicate it." Makarova

v. United States, 201 F.3d 110, 113 (2d Cir. 2000).  Once

subject matter jurisdiction is challenged the burden of

establishing jurisdiction rests with the party asserting that it

exists.  See Thompson v. Gaskill, 315 U.S. 442, 446, 62 S. Ct.

673, 86 L. Ed. 951 (1942) (citations omitted).  The party

asserting subject matter jurisdiction has the burden of proving,

by a preponderance of the evidence, that the court has subject

matter jurisdiction.  See Makarova, 201 F.3d at 113.


     Absent diversity of citizenship, whether federal

courts have federal question jurisdiction is typically governed

by the longstanding well-pleaded complaint rule, in which "a

suit 'arises under' federal law 'only when the plaintiff's

statement of his own cause of action shows that it is based upon

[federal law].'"  Vaden v. Discover Bank, 556 U.S. 49, 60, 129

S. Ct. 1262, 173 L. Ed. 2d 206 (2009) (quoting Louisville &

Nashville R. Co. v. Mottley, 211 U.S. 149, 152, 29 S. Ct. 42, 53

L. Ed 126 (1908)).


     The Supreme Court has ruled that a case may arise

under federal law within the meaning of 28 U.S.C. § 1331 if "the

plaintiff's right to relief [under state law] necessarily

depends on resolution of a substantial question of federal law."

Franchise Tax Bd. v. Constr. Laborers Vacation Trust for S.

Cal., 463 U.S. 1, 28, 103 S. Ct. 2841, 77 L. Ed. 2d 420 (1983).

In Grable & Sons Metal Products, Inc. v. Darue Engineering &

Manufacturing, the Supreme Court addressed the circumstances

under which "federal-question jurisdiction will lie over state-

law claims that implicate significant federal issues." 545 U.S. 308, 312, 125 S. Ct. 2363, 162 L. Ed. 2d 257 (2005). <u>Grable</u> involved a quiet title action brought in state court under state law between two private parties. <u>Id.</u> at 311. Even though no federal cause of action was pled, the defendant removed the case to federal court on the ground that his right to title depended upon the validity of the process employed by his predecessor in title to enforce a federal tax lien. <u>Id.</u>

The Supreme Court affirmed the exercise of jurisdiction, noting that while federal question jurisdiction is typically invoked in respect to causes of action created by federal law, the Court had "recognized for nearly 100 years that in certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues." <u>Id.</u> at 312 (citation omitted). Thus, federal question jurisdiction is appropriately exercised when a case involves "a state-law claim [that] necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." <u>Id.</u> at 314.

"[A] complaint seeking a declaratory judgment is to be

tested, for purposes of the well-pleaded complaint rule, as if the party whose adverse action the declaratory judgment plaintiff apprehends had initiated a lawsuit against the declaratory judgment plaintiff." Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc., 697 F.3d 59, 68 (2d Cir. 2012) (quoting Fleet Bank, N.A. v. Burke, 160 F.3d 883, 886 (2d Cir. 1998)).  In other words, the Court "must conceptually realign the declaratory judgment parties and claims and analyze them as they would appear in a coercive suit."  Id. at 67.

Here, the underlying coercive suit is UBS' demand for arbitration against NASDAQ.  As discussed above, in that action, UBS asserts four claims against NASDAQ arising from or connected with the relationship governed by the Service Agreement between the parties:  (1) breach of contract; (2) indemnification; (3) breach of implied duty of good faith and fair dealing; and (4) gross negligence.  (Demand ¶¶ 58-76).

According to UBS, under the "conceptual realignment" required to analyze whether subject matter jurisdiction exists over a declaratory judgment action, the issue is whether UBS' claims in the underlying arbitration arise under the laws of the United States.  UBS asserts that NASDAQ cannot meet their burden of demonstrating that the instant action raises a substantial

22

federal issue to trigger this Court's subject matter
jurisdiction because the underlying claims in the Demand are all
based on state law and an interpretation of the Services
Agreement.  It also maintains that the instant case is
substantially different from the claims in <u>Zack</u>, in which this
Court found "substantial federal concerns prominently figuring .
. . to confer federal question jurisdiction."  2013 WL 52519, at
*10.

On the other hand, NASDAQ contends that UBS'
allegations cannot be resolved merely by contract interpretation
and instead requires the resolution of the federal question as
to whether NASDAQ fulfilled its obligations as a national
securities exchange registered under Section 6 of the Exchange
Act.  It maintains that "[t]he claims UBS asserts against NASDAQ
are no different than those asserted by [the Zack Plaintiffs] in
respect to the federal questions they implicate" and requires
"precisely the sort of issues that may properly be decided in
federal court[.]" (Pl. Memo in Further Support at 3, 8).

First, under the artful pleading rule, which exists as
an "independent corollary" to the well-pleaded complaint rule, a
party may not avoid federal jurisdiction "by omitting to plead
necessary federal questions in the complaint," or in this case,

23

the Demand.  Courts are empowered to determine whether a party
"cloth[ed] a federal law claim in state garb."  Travelers Indem.
Co. v. Sarkisian, 794 F.2d 754, 758 (2d Cir. 1986).  Thus, while
UBS purports to assert claims against NASDAQ on state law
theories alone, the underlying nature of the claims in the
Demand must be examined.

Here, the Demand echoes many of the same assertions
made by the Zack Plaintiffs, including allegations that UBS (1)
suffered losses as a result of the system issues experience by
NASDAQ that delayed the execution or confirmation of certain
orders submitted in the Facebook IPO Cross; (2) criticized the
design of the NASDAQ IPO Cross and NASDAQ's decision not to halt
trading in Facebook shares on the day of the IPO; and (3)
asserted claims against NASDAQ based on state law that hinge on
the contention that NASDAQ's conduct was negligent.  (Compare,
e.g., Demand ¶¶ 3, 8 (NASDAQ "mishandle[ed] the opening and
trading in Facebook's newly-issued common stock, . . .
depart[ed] from standard practices, and . . . fail[ed] to
postpone or halt trading until it could remedy its systems
failures[.]"), with Zack Compl. ¶ 57 (NASDAQ failed "to execute
trade orders promptly, accurately and efficiently, to maintain
an orderly trading market and to halt trading . . . .")).

Indeed, the allegations in the Demand place NASDAQ's IPO Cross and its trading commencement and halt decisions at the center of UBS' claims, which are processes governed by NASDAQ Exchange Rules 4120 ("Limit Up-Limit Down Plan and Trading Halts") and 4753 ("Nasdaq Halt and Imbalance Crosses").[5]  The Demand also appears to regard NASDAQ's asserted failures as failures of duties imposed on NASDAQ as "a self-regulatory organization . . . within the meaning of the Securities Exchange Acrt of 1934 . . . responsible for operating and maintaining the integrity of the Nasdaq stock market."  (Demand ¶ 14(a)).  UBS further alleges that "[a]n exchange is required to operate a fair and orderly market.  This is its primary obligation to the investing public and to entities such as UBS.  Nasdaq violated

---

[5] NASDAQ adopted, through the Exchange Act's public rulemaking process and with SEC approval, rules governing the Exchange's IPO Cross process – namely, Exchange Rules 4120("Trading Halts") and 4753 ("Nasdaq Halt and Imbalance Crosses").  As explained in a recent filing amending Rule 4753:

> Rule 4120(a)(7) provides that trading in an IPO security is halted until the security is released for trading. Rule 4120(c)(7)(B) establishes the process for lifting the halt and commencing trading.

> Under that rule, prior to terminating the halt, there is a 15-minute Display-Only Period during which market participants may enter quotes and orders into the NASDAQ Market Center. At the conclusion of the Display-Only Period trading commences through the halt cross process provided for in Rule 4753.

Notice of Filing and Immediate Effectiveness of Proposed Rule Change To Amend Rule 4120, SEC Rel. No. 34-66652 (Mar. 23, 2012), 77 Fed. Reg. 19,044 (Mar. 29, 2012) (amending Rule 4120 to permit IPO orders to be entered prior to the start of the Display-Only Period on the day of an IPO).

The current versions of Exchange Rules 4120 and 4753 are available at http://nasdaq.cchwallstreet.com/.

this obligation." (Id. ¶ 37).

Such claims necessarily implicate substantial federal questions that require "an inquiry as to whether NASDAQ's conduct in connection with the Facebook IPO was or was not consistent with the duties imposed upon NASDAQ as a national securities exchange registered under the Exchange Act, the rules and regulations promulgated by the SEC under the Exchange Act and NASDAQ's own rules . . . ." Zack, 2013 WL 525191, at *9 (citation omitted); see also Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc, 159 F.3d 1209, 1212 (9th Cir. 1998) (holding that although plaintiff's "theories are posited as state law claims, they are founded on the defendants' conduct in suspending trading and de-listing the offering, the propriety of which must be exclusively determined by federal law.").

In addition, both parties rely on and seek to distinguish the Second Circuit cases in Barbara v. New York Stock Exchange, Inc., 99 F.3d 49 (2d Cir. 1996) and D'Alessio v. New York Stock Exchange, Inc., 258 F.3d 93 (2d Cir. 2001) to support their respective positions. In Barbara, the SEC initiated an investigation into alleged misconduct by Barbara, a floor clerk at the NYSE. Barbara, 99 F.3d at 51. After the SEC filed disciplinary charges and the NYSE suspended Barbara from

working on its floor, he commenced an action in state court
alleging various state law claims on the premise that the NYSE's
actions were contrary to its internal rules governing admission
to the exchange floor.  Id. at 52.  Barbara's complaint alleged
that the NYSE had wrongfully barred him from the Exchange floor,
thereby damaging his reputation and causing him to lose
employment opportunities.  Id.  The NYSE subsequently removed
the action to federal court, and the district court dismissed
Barbara's suit on grounds of failure to exhaust administrative
remedies.  Id. at 52-53.  On appeal, the Second Circuit affirmed
the dismissal.  Id. at 51.


        Although Barbara did not move to remand and the
jurisdictional issue was not addressed by the district court or
raised by either party on appeal, the Second Circuit sua sponte
raised the question of subject matter jurisdiction.  Id. at 53.
The Court, in dictum, noted that Barbara's original complaint
did not present a federal question sufficient to justify the
district court's exercise of subject matter jurisdiction, as
"the existence vel non of . . . a private right of action [under
federal law] is the starting point for our inquiry into the
substantiality of the federal questions involved in a lawsuit."
Id. at 54.  The Court reasoned that Barbara had no such federal
claim because "the class of persons for whose benefit section

27

78f(d) [of the Exchange Act] was enacted consisted of investors in the securities markets, [thus] any private right of action under section 78f(d) was available only to such investors and did not extend to member organizations of securities exchanges" or their employees.  Id. at 54 (stating that Barbara was not a member of the investing public, "but rather of the class of persons whose conduct is regulated by the Exchange pursuant to its duties under the Exchange Act.").  The Court determined that internal rules of an exchange, such as its disciplinary rules and procedures, are "contractual in nature . . . interpreted pursuant to ordinary principles of contract law, an area in which the federal courts have no special expertise."  Id. at 54-55.  Accordingly, the Court concluded that Barbara's state law claims were insufficiently substantial to confer federal question jurisdiction.  Id. at 55.


       UBS maintains that the instant case is more like the claims in Barbara and less like those in Zack because UBS has a contractual relationship with NASDAQ, its claims arise out of that contractual relationship, and that resolution of its claims are a matter of contract interpretation, and not a matter of NASDAQ's duties as a national securities exchange registered under the Exchange Act.  UBS also contends that the specific issue in this lawsuit is the applicability of the arbitration

clause, which does not reach the underlying claim, such as NASDAQ's duties in connection with the IPO.

While UBS focuses on certain factors which the Barbara Court found "counsel[ed] against a finding of federal jurisdiction," id. at 54, it ignores the specific facts of that case and understates the importance of the federal issues to the resolution of UBS' claims against NASDAQ.  At issue in Barbara was the discrete question of "whether disciplinary proceedings initiated by the NYSE were consistent with its own rules and its contractual obligations to its members."  D'Alessio, 258 F.3d at 101.  The Second Circuit concluded that the circumstances under which the NYSE could properly exclude a trader from the floor of the exchange were of insufficient federal importance to justify the exercise of federal question jurisdiction.  Barbara, 99 F.3d at 55.

In D'Alessio, however, the Second Circuit found that "the 'federal ingredient' in the present action [was] far more significant than the federal interest in Barbara."  258 F.3d at 103.  While D'Alessio's claims were cast as state law claims, the Court reasoned that D'Alessio's complaint did not "simply challenge the propriety of disciplinary proceedings conducted by the NYSE."  Id. at 101.  Instead, D'Alessio's claims were

"premised, in large part, on the NYSE's failure to enforce and
monitor compliance by its members with the Exchange Act and the
rules and regulations thereunder, as well as the rules
promulgated by the NYSE pursuant to the Exchange Act." Id. at
103.  The Second Circuit noted that "[t]he source of the duty
imposed on the NYSE (as well as other SROs) is found in federal
law; namely, in the Exchange Act.  Thus, it is the propriety of
the NYSE's actions, as prescribed under federal law, that is at
the heart of D'Alessio's claims." Id. (emphasis in the
original).  The Court concluded that there was a sufficiently
substantial federal interest to support removal to federal court
because the adjudication of the claims "necessarily require[d] a
court to construe both the federal law governing securities
trading on a national exchange and the NYSE's role, as defined
under federal law, in enforcing and monitoring a member's
compliance with those laws." Id. at 104 (emphasis in the
original).

Similarly, here, the gravamen of UBS' claims is
premised on NASDAQ's purported "violat[ion]" of its "primary
obligation" as an SRO under the Exchange Act (Demand ¶ 37), and
one of its claims sounds not in contract, but in negligence,
like the claims asserted by the Zack Plaintiffs.  The Services
Agreement between NASDAQ and UBS did not address the scope of

NASDAQ's duties to operate the Exchange, except by reference to certain NASDAQ Rules.  The application of such exchange rules and NASDAQ's other obligations under the Exchange Act in the context of the Facebook IPO implicate the kind of federal questions that supported the exercise of jurisdiction in Zack. In addition, the arbitrability of UBS' claims implicates another federal question as to the applicability of NASDAQ Rule 4626 as the exclusive mechanism for the adjudication of claims arising out of a member's use of the Nasdaq Market Center.

The interpretation and application of SEC-approved rules and the duties that stem from the Exchange Act in the context of the operation of a national securities exchange are issues of paramount federal concern, which demand uniform federal application, over which federal courts have "special expertise" and state courts and commercial arbitrators do not. See Zack, 2013 WL 525191, at *7.  Accordingly, there are substantial federal concerns in the instant case to confer subject matter jurisdiction.

## B) The Injunction is Granted and the Arbitration is Enjoined

Under Second Circuit law, an injunction is properly granted when the plaintiff shows "(a) irreparable harm and (b)

31

either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief." Citigroup Global Mkts., Inc. v. VGS Special Opportunities Master Fund, Ltd., 598 F.3d 30, 35 (2d Cir. 2010) (quoting Jackson Dairy, Inc. v. H.P. Hood & Songs, Inc., 596 F.2d 70, 72 (2d Cir. 1979)).

As a matter of law, there is irreparable harm when a party is "compelled to arbitrate . . . without having agreed to arbitration" because that party is "'forced to expend time and resources arbitrating an issue that is not arbitrable . . . .'" UBS Sec. LLC v. Voegeli, 684 F. Supp. 2d 351, 354 (S.D.N.Y. 2010) (quoting Merrill Lynch Inv. Managers v. Optibase, Ltd., 337 F.3d 125, 129 (2d Cir. 2003)). "[I]t is not merely expense that underlies the prohibition against forcing a party to arbitrate a dispute that it did not agree to arbitrate," but also the concern that a party will "lose its right to have [its] claim adjudicated in a court of law, rather than an arbitral forum to whose jurisdiction it has not consented." Id., see also Tellium, Inc. v. Corning Inc., No. 03-8487, 2004 WL 307238, at *3 (S.D.N.Y. Feb. 13, 2004) ("Compelling arbitration of a matter not properly subject to arbitration constitutes per se

irreparable harm.") (internal citation and quotation omitted).

Thus, courts in this Circuit have enjoined arbitrations when the parties did not agree to arbitrate the claims asserted therein.  See In re Am. Express Fin. Advisors Sec. Litig., 672 F.3d 113, 142 (2d Cir. 2011) (stating that "a district court may properly enjoin arbitration proceedings that are not covered by a valid and binding arbitration agreement . . . ."); Voegeli, 684 F. Supp. 2d at 355-56 (granting UBS' request for a declaratory judgment and permanent injunction restraining defendants from prosecuting their non-arbitrable claims against UBS in a FINRA arbitration.).

NASDAQ contends that it is likely to succeed on the merits because UBS' claims indisputably "aris[e] out of the Nasdaq Market Center or its use," and are therefore governed by Rule 4626.  According to NASDAQ, the claims are therefore outside the scope of the arbitration provision of the Services Agreement, highlighting that the arbitration provision states at the outset that "**[e]xcept as may be provided in the NASDAQ OMX Requirements**, all claims disputes, controversies, and other matter in question between the Parties . . . shall be settled by final binding arbitration . . . ." (Services Agreement § 18(a)) (emphasis added).  Alternatively, NASDAQ maintains that, at a

minimum, it has met the alternative standard showing that there are "serious questions" as to the merits and that the balance of hardships weighs in its favor.

UBS, on the other hand, contends that Nasdaq has not shown a likelihood of success on the merits, or even a serious question going to the merits.  UBS avers that, pursuant to the parties' agreement, the issue of whether UBS' claims are arbitrable is for the arbitrators, not the Court, to decide. Alternately, UBS maintains that even if the Court were to decide the issue of arbitrability, the parties' agreement clearly provides that disputes like UBS' claims against NASDAQ are to be resolved in arbitration.

## This Court Should Decide Arbitrability

The question of who should decide whether a dispute is arbitrable "turns upon what the parties agreed about that matter."  First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995) (emphasis in original).  "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so."  Id., 514 U.S. at 944 (quoting AT&T Technologies, Inc. v. Communications Workers

of America, 475 U.S. 643, 649, 106 S. Ct. 1415, 89 L. Ed. 2d 648 (1986)).  Thus, any silence or ambiguity about whether the parties have agreed to arbitrate arbitrability "reverses the usual presumption that issues should be resolved in [arbitration's] favor."  U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd., 241 F.3d 135, 146 (2d Cir. 2001) (internal quotations and citations omitted); see also PaineWebber v. Bybyk, 81 F.3d 1193, 1198 (2d Cir. 1996) (stating that "where the arbitration agreement contains an ambiguity as to who determines eligibility, the Act's presumption favoring arbitration is reversed so that the court will ordinarily decide the question.") (quoting First Options, 514 U.S. at 944).

Section 18(A) of the Services Agreement provides that, "**[e]xcept as may be provided in the NASDAQ OMX Requirements,** all claims, disputes, controversies, and other matters in question between the Parties to this Agreement . . . shall be settled by final binding arbitration . . . ." (Services Agreement § 18(A)) (emphasis added).  "NASDAQ OMX Requirements" is defined as follows:

> **"NASDAQ OMX Requirements"** shall mean (i) the rules, regulations, interpretations, decisions, opinions, orders and other requirements of the [SEC]; (ii) the applicable **rules**, regulations, disciplinary decisions, and **rule interpretations of self-regulatory**

**organizations;** (iii) NASDAQ OMX's operating
procedures, specifications, requirements, and other
documentation that is regulatory or technical in
nature (including, but not limited to, user guides)
published on the NASDAQ Trader website located at
www.nasdaqtrader.com ("NASDAQ Trader") or another
NASDAQ OMX website accessible by and made known to
Subscriber; (iv) all other applicable laws, statutes,
rules, regulations, orders, decisions,
interpretations, opinions, and other requirements,
whether promulgated by the United States or any other
applicable jurisdiction (including in the area of
intellectual property); and (v) the successors, as
they may exist at the time, of the components of the
NASDAQ OMX Requirements.

(Id. § 1(A)) (emphasis added).  In addition, Section 18(B) of

the Services Agreement states that "any arbitration proceeding

shall be conducted in accordance with the Commercial Arbitration

Rules of the American Arbitration Association or in accordance

with such other rules and procedures as are agreed to by the

Parties."  (Id. § 18(B)).


UBS avers that the language of the parties' agreement

here is broad and contains no carve-out provision because the

Services Agreement states that "all claims, disputes,

controversies, and other matters in question between the Parties

to this Agreement . . ." are subject to arbitration.  It

contends that New York law is clear that, when parties adopt

this type of broad arbitration language that NASDAQ included in

the Services Agreement, it translates to clear and unmistakable

evidence that they intended that the issue of arbitrability be decided by the arbitrator.  UBS also contends that the parties further demonstrated their intent to submit questions of arbitrability to the arbitrators by providing that arbitration would be pursuant to the AAA Rules.  (See id.).

    To support its argument, UBS cites to Life Receivables Trust v. Goshawk Syndicate 102 at Lloyd's, in which the agreement provided for arbitration of "[a]ll disputes and differences arising under or in connection with this Insurance . . . ."  66 A.D.3d 495, 498 (1st Dep't 2009).  Based in part on the "breadth" of that provision, the court ruled that the parties clearly and unmistakably agreed to arbitrate disputes about the validity of the arbitration agreement.  Id.  Likewise, in PaineWebber, the Second Circuit held that under New York law, contractual reference to "any and all" controversies being resolved by arbitration means that questions of arbitrability were for the arbitrators, because "[t]he words 'any and all' are elastic enough to encompass disputes over . . . whether a claim is within the scope of arbitration."  81 F.3d at 1199–1200.  According to UBS, these courts have held that broad language in a contract reaches controversies relating to the arbitrability of the parties disputes.

Here, unlike in those cases, the beginning clause of Section 18(A) of the Services Agreement is a carve-out provision that precludes allowing the arbitrator to decide arbitrability. To adopt UBS' interpretation of the Services Agreement would render the first ten words of the arbitration provision nugatory and run contrary to the tenet of contract interpretation that all contractual provisions should be afforded meaning. See Shaw Group, Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 121, 124 (2d Cir. 2003) (stating that a contract "should be construed so as to give full meaning and effect to all of its provisions" and "an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.'") (quoting Galli v. Metz, 973 F.2d 145, 149 (2d Cir. 1992)).  The presence of the exception does not evince a clear willingness to submit the issue of arbitrability to be decided by the arbitrator rather than the Court.  See Katz v. Feinberg, 290 F.3d 95, 97 (2d Cir. 2002) (holding that the presence of a broad arbitration clause with a carve-out for certain claims created an ambiguity, thus requiring arbitrability to be determined by the court).

In addition, under New York law, "[w]here there is a broad arbitration clause and the parties' agreement specifically incorporates by reference the AAA rules providing that the

arbitration panel shall have the power to rule on its own
jurisdiction, courts will 'leave the question of arbitrability
to the arbitrators[.]'" Zachariou v. Manos, 891 N.Y.S.2d 54, 55
(N.Y. App. Div. 2009).   However, where, as here, "the parties'
agreement contains a narrow arbitration provision, the reference
to the AAA rules does not constitute clear and unmistakable
evidence that they intended to have an arbitrator decide
arbitrability." Id.   Further, in Matter of Pharmacia & Upjohn
Co., the panel held that because "the clause in question not
only excepts disputes involving intellectual property rights
from arbitration but also, in equally clear language, removes
the exception for intellectual property disputes from the Rules
of the AAA," the question of arbitrability was for the court.
781 N.Y.S.2d 95, 98 (2004).   The arbitration clause here mirrors
the one in Pharmacia, as it provided that disputes "otherwise
provided [for] herein" shall not be subject to the AA rules.
(See Services Agreement § 18(B) (**"Except as otherwise provided
herein** or by agreement of the Parties, any arbitration
proceeding shall be conducted in accordance with the Commercial
Arbitration Rules of the [AAA]. . . .") (emphasis added).

        Taken together, UBS has not shown "clear and
unmistakable" evidence that the parties unambiguously committed
to arbitration.   At minimum, a provision that begins with the

words "[e]xcept as may be provided in the NASDAQ OMX Requirements," creates an ambiguity as to whom the parties intended to submit questions of arbitrability.  Accordingly, the Court, not an arbitrator, may decide whether UBS may arbitrate its claims.

UBS' Claims Do Not Fall Within the Scope of the Arbitration Provision of the Services Agreement

The Federal Arbitration Act, 9 U.S.C. § 1, et seq., reflects a strong federal policy favoring arbitration as a form of dispute resolution.  United Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 596, 80 S. Ct. 1347, 4 L. Ed. 2d 1409 (1960).  Similarly, New York State's policy "is to favor and encourage arbitration as a means of expediting the resolution of disputes and conserving judicial resources." Rio Algom, Inc. v. Sammi Steel Co., 168 A.D.2d 250, 251 (1st Dep't 1997) (citation omitted).  However, an agreement "is a matter of contract[,] and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." United Steelworkers, 363 U.S. at 582.

Courts look to two factors to determine if a dispute is subject to arbitration: (1) whether the parties are bound by an arbitration agreement; and (2) whether the agreement applies

to the particular controversy.  <u>See Bank Julius Baer & Co. v.</u>
<u>Waxfield Ltd.,</u> 424 F.3d 278. 281 (2d Cir. 2005); <u>PaineWebber</u>, 81
F.3d at 1198.  The parties do not dispute that they are bound by
the arbitration provision of the Services Agreement.  Instead,
the only issue in dispute is whether UBS' claims fall within the
scope of that provision.

As discussed above, the arbitration provision of the
Services Agreement begins by stating that it applies to claims
"[e]xcept as may be provided in the NASDAQ OMX Requirements."
(Services Agreement § 18(A)).  Rule 4626 is a NASDAQ OMX
Requirement that precludes arbitration of UBS' claim because its
"accommodation procedure . . . provides the exclusive mechanism
for members to request and receive compensation for trading
losses arising from NASDAQ system issues, such as those
experienced in the Facebook IPO."  (Pl. Brief in Support at 23).
Thus, in NASDAQ's view, arbitration of UBS' claim is not
permitted.

In opposition, UBS contends that the plain language of
Rule 4626 demonstrates that the accommodation procedure "is a
voluntary mechanism that Nasdaq 'may' use to compensate users of
the Nasdaq Market Center for certain losses."  (Def. Brief in
Opp. at 23).  According to UBS, whatever the rule may merit as a

defense against liability, "it says nothing at all on the subject of what forum is appropriate for users with claims who choose not to seek compensation under the accommodation procedure." (Id.).

UBS also avers that by requiring a release of members who participate in the accommodation process for Facebook claims, NASDAQ has interpreted the process to be non-exclusive. UBS highlights a statement made by NASDAQ in the rulemaking process that "[m]embers that would prefer not to release Nasdaq and instead attempt to pursue claims against it, notwithstanding the otherwise applicable provisions of Rule 4626, the judicially recognized doctrine of [SRO] immunity, the contractual limitations on such claims, and Nasdaq's defenses to the substance of such claims, are obviously free to do so." (See Pl. Opp. at 24 & n.13).

However, NASDAQ's discretion to grant accommodation or require a release does nothing to alter Rule 4626 as an alternative mechanism for member to pursue claims barred by Rule 4626(a). The Rule provides a procedure, other than arbitration, for the submission, consideration and resolution of claims arising out of members' use of the Nasdaq Market Center. Indeed, UBS and NASDAQ's other members have interpreted the Rule

in the same manner by regularly invoking the Rule 4626
accommodation procedure but never previously seeking to proceed
through arbitration.

To the extent UBS contends that the Services Agreement
provides a basis for an indemnification claim that is "separate
from and independent of any limitation under Rule 4626, as
recently reconfirmed by the SEC in approving the accommodation
policy, Rule 4626 applies to any claims arising out of the
Nasdaq Market Center or its use, including indemnification
claims.  See 78 Fed. Reg. 19,041; Rule 2626(a) ("Any losses,
damage, or other claims, related to a failure of the Nasdaq
Market Center . . . **shall be absorbed by the member, or the
member sponsoring the customer, that entered the order . . . .**")
(emphasis added).  The limitation of liability provision of the
Services Agreement merely lists separately Rule 4626 and the
indemnification provision of the Services Agreement among other
exceptions to the contractual limitation of NASDAQ's liability.
In addition, Section 17 of the Services Agreement states that
Rule 4626 supersedes any potentially inconsistent provisions of
the Services Agreement, including Section 12(B).  (Services
Agreement § 17).

Lastly, with respect to Facebook IPO claims, Rule

43

4626(b): (i) premises compensation for member claims based on customer orders on the member attesting to its reimbursement of its customers; and (ii) establishes a category of compensable claims for members who accommodate their customers.  Rules 4626(b)(3)(F), 4626(b)(3)(A)(iv).  Rule 4626 also "strictly limits the amount of compensation that may be paid to users of the Nasdaq Market Center."  The NASDAQ Stock Market LLC, Order Granting Approval of a Proposed Rule Change to Amend Rule 4626 – Limitation of Liability, SEC Rel. No. 34-69216 (Mar. 22, 2013), 78 Fed. Reg. 19,040, 19,045 (Mar. 28, 2013).  Thus, Rule 4626, as approved by the SEC, appears to serve the dual purpose of providing for a mechanism for members to assert their claims arising from the Facebook IPO, and also constraining NASDAQ to certain limits to compensate for such claims.

Taken together, NASDAQ has demonstrated that the arbitration should be enjoined because it is likely to succeed on the merits and will suffer irreparable harm.  Given the substantial federal issues posed by UBS claims, the threat of an arbitration panel issuing a decision that may conflict with the decision of a federal court in a parallel litigation also weighs strongly against permitting UBS to proceed with its arbitration proceeding.  Cf. AT&T Mobility LLC v. Concepcion, --- U.S. ---, 131 S. Ct. 1740, 1750-52, 179 L. Ed. 2d 742 (2011) (cautioning

against allowing arbitration of class claims unless provided by
the parties' contract because of the increased risks to
defendants and the limited scope of judicial review of
arbitration awards).  Having found that this Court may properly
address the issue of arbitrability and the UBS' claims are not
arbitrable, the Defendant's motion to dismiss the Complaint is
denied.


## IV.  Conclusion

        Based on the conclusions set forth above, Plaintiff's
motion for preliminary injunction is granted, and Defendant's
cross-motion to dismiss the Complaint is denied.


        This opinion will be sealed, unless the parties meet
and confer with respect to unsealing or if necessary, redactions
are submitted to permit an amended opinion to be filed.


        It is so ordered.


**New York, NY**
**June 18, 2013**

_____
                            ROBERT W. SWEET
                            U.S.D.J.